## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JASON HALL,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | **NO. 07-cv-4724** |
| | ) | |
| **BEST BUY CO., INC.,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

**Rufe, J.**                                                **March 24, 2011**

      The Parties in this putative class action alleging violations of Pennsylvania wage and labor laws have jointly moved for final approval of a negotiated settlement agreement and allocation among class members [doc. no. 79], and Plaintiffs have moved for approval of Plaintiffs' request for attorneys' fees and expenses and enhancement awards for the class representatives Jason Hall, Samuel Keck and Paul Eisenhower [doc no. 80].  After multiple hearings on the fairness of the settlement and adequacy of notice, and for the reasons that follow, the Court will: (1) certify the settlement class; (2) approve the Agreement, finding that pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, its terms are fair, reasonable and adequate, and that the class received both reasonable and the best practicable notice of the settlement; and (3) approve Plaintiffs' request for attorneys fees and enhancement awards, finding both reasonable.

# I. BACKGROUND

## A. The Litigation

On October 17, 2007, Plaintiff Jason Hall filed a complaint against Best Buy Co., Inc. in the Court of Common Pleas of Philadelphia County, Pennsylvania, alleging breach of contract, unjust enrichment, and violations of Pennsylvania's Wage Payment and Collection Law ("WPCL"),[1] on behalf of a class defined as all those employed by Best Buy between October 15, 2003 and the time of filing and subject to the alleged unlawful employment practices. On November 8, 2007, Defendant Best Buy timely removed the state court action to this Court pursuant to 28 U.S.C. §§ 1332(d), 1441, 1453 and 1446.[2]

On December 5, 2007, Hall subsequently amended his complaint, adding putative class

_____

[1] 43 Pa. Cons. Stat. § 260.10, *et seq.*

[2] <u>See</u> Notice of Removal [doc. no. 1].

This Court has subject matter over this action pursuant to the Class Action Fairness Act, which vests this Court with original jurisdiction and permits removal from state court where one class member is diverse from one defendant, the class size exceeds 100, and the aggregate amount in controversy exceeds $5,000,000. <u>See</u> 28 U.S.C. §§ 1332(d) & 1453. Here, named plaintiff Hall is a resident of Pennsylvania (as are the majority of class members), Defendants are not citizens of Pennsylvania, and there are more than 100 class members. <u>See</u> Notice of Removal ¶¶ 16–23 & Ex. B. ¶¶ 3–4. Further, though the Complaint does not quantify relief sought by the putative class, the amount in controversy is sufficient for jurisdiction under the legal-certainty test. <u>See</u> <u>Kaufman v. Allstate N.J. Ins. Co.</u>, 561 F.3d 144, 151–52 (3d Cir. 2009). Here, there are at least 20,455 class members. <u>See</u> Mem. in Supp. of Joint Mot. for Settlement Approval and Allocation Among Class Members [doc. no. 79] ("Mem. in Supp. of Final Approval") at 7. The putative class asserts a wide range of claims against Best Buy, including breach of contract, unjust enrichment and violations of the Pennsylvania Minimum Wage Act, 43 Pa. Cons. Stat. Ann. § 333.101 and the WPCL, <u>id.</u> § 260, *et seq.*, for non-payment of wages between October 17, 2003 and the time of filing. <u>See</u> Am. Class Action Compl. [doc. no. 7] ("Am. Compl.") ¶¶ 13–17, 20–24, 27–63. Plaintiffs seek actual damages plus prejudgment interest, liquidated damages, special damages, and attorneys' fees and costs. <u>Id.</u> ¶ 72; Notice of Removal ¶ 24. Under the WPCL, the statutory minimum for liquidated damages is $500 per individual. 43 Pa. Cons. Stat. Ann. § 260.10. Here, where the class includes well more than 10,000 members, the minimum liquidated damages for the class would exceed the jurisdictional requirement of $5,000,000. Accordingly, jurisdiction exists under § 1332(d)(2).

representatives Samuel Keck and Paul Eisenhower; Defendants BBC Investment Co., BBC Property Co., and Best Buy Stores, L.P. (collectively "Best Buy"); and a claim for violation of the Pennsylvania Minimum Wage Act.[3] The Amended Complaint set the class period beginning at October 17, 2003 and continuing until such time as the complained-of practices were eliminated.[4] Named Plaintiffs alleged that, in violation of applicable state wage and labor statutes, Best Buy had a consistent policy of failing to compensate in-store hourly employees with either straight-time or overtime pay for off-the-clock time spent awaiting and undergoing security checks after the end of a shift; denying mandatory meal and rest breaks and failing to compensate for work performed during them; and requiring employees to perform off-the-clock work prior to clocking in and after clocking out, among other allegations.[5] Plaintiff Hall alleged that he and other employees were required to wait up to 15 minutes per day for post-shift security checks, depending on whether the shift ended during store hours or after closing.[6] Closing-shift employees allegedly endured the lengthiest waits because of Best Buy's alleged practice of requiring all employees to gather at the front of the store prior to the security checks.[7] Plaintiff Keck alleged that management routinely required that he and other employees work through lunch breaks and mandatory 15-minute rest periods without compensation and to perform retail

_____

[3] Am. Compl. ¶¶ 5–6, 18–32, 45–52.

[4] Am. Compl. ¶ 1.

[5] Am. Compl. ¶¶ 33–34.

[6] Am. Compl. ¶ 13.

[7] Am. Compl. ¶ 14.

sales work, such as paperwork, after clocking out.[8]  Finally, Plaintiff Eisenhower alleged that, in

addition to uncompensated time spent waiting for security checks at a shift's end, he was

uncompensated for waiting periods and shift-work performed prior to clocking in.[9]

Best Buy has denied Plaintiffs' allegations and asserted a range of affirmative defenses

that, if proved, could entitle them to judgment on Plaintiffs' claims, limit Plaintiffs' recovery or

prevent certification of the proposed class.[10]

Following amendment of the Complaint, discovery ensued shortly thereafter, with

discovery deadlines extended several times through early 2009.[11]  The named Plaintiffs and

corporate representatives were deposed and documents were produced by the Parties.[12]  In

particular, Best Buy produced paper documents (such as manuals and policies), video recordings,

and electronic time-keeping data.  At some point in late 2008, settlement negotiations began and,

on February 26, 2009, a proposed conditional settlement agreement was reached, which was

memorialized in a Joint Stipulation and Settlement Agreement (the "Settlement Agreement") in

November 2009.[13]

---

[8]  Am. Compl. ¶¶ 21–23.

[9]  Am. Compl. ¶¶ 27-29.

[10]  Answer & Affirmative Defenses by BBC Inv. Co., BBC Prop. Co., Best Buy Stores, L.P. & Best Buy Co., Inc. [doc. no. 8].

[11]  Doc. nos. 18, 22, 23 & 24.

[12]  Pls.' Mot. & Mem. in Supp. of Pls.' Application for Prelim. Approval of Class Action Settlement, Certification of Settlement Class, Approval of Claims Administrator and Publication of Notice ("Prelim. Approval Mem.") [doc. no. 32] at 3.

[13]  Joint Stipulation & Settlement Agreement ("Joint Stip.") [doc. no. 32-1] at 3; Prelim. Approval Mem. at 3.

## B.     The Settlement Agreement

The Settlement Agreement establishes a total settlement fund of $907,566.[14]  Of that

amount: (1) $592,566, designated by the agreement as the "Net Settlement Amount" is allocated

to class members for unpaid wages during closing shifts, with $241,757 allocated to current

employees and $350,809 allocated to former employees; (2)  $15,000 is allocated for

Enhancement Awards for Class Representatives; and (3) a maximum of $300,000, or just over

33% is allocated for class counsels' fees & expenses.[15]  Costs of claims administration are borne

by Defendants; these costs do not reduce the amounts available to the class.[16]

The amount designated for individual class members is based on the number of closing

shifts worked by that class member during the class period.  A closing shift is a shift worked in

which the employee clocks in or out after the last customer transaction of the day.[17]  Under the

Agreement, class members are compensated at a rate of $.50/closing shift worked during the

class period.[18]  At the initial final approval hearing, Class Counsel represented that the $0.50 rate

was based on both an average wage of $8.00 and an average of five minutes in off-the-clock

waiting time discerned through discovery.  Employees working five or fewer closing shifts,

however, are presumed to have worked five shifts, such that every employee is entitled to a claim

---

[14]  Mem. in Supp. of Final Approval at 4.

[15]  Mem. in Supp. of Final Approval at 4;  Joint Stip. ¶¶ 2.2.2, 2.11.

[16]  Joint Stip. ¶ 2.7.1.

[17]  Joint Stip. ¶ 1.11.

[18]  Joint Stip. ¶ 2.3.

of at least $2.50, whether or not they worked a closing shift.[19]  Participating claimants' payments

are subject to payroll taxes and other payroll withholdings such that the net amount they receive

will be lower than the gross claim.[20]  Unclaimed amounts from the Settlement Fund revert back

to Best Buy.[21]

The Settlement Agreement also provides for limited injunctive relief, requiring Best Buy

to modify its Standard Operating Procedure Manual, for at least two years, to include language

addressing time-keeping procedures for employees who exit the store after store closing. The

agreement requires adoption of language substantially similar to the following:

> Only Managers, Key-Holding Supervisors, or Inventory/LP Team Members are
> authorized to unlock the front doors for exiting employees when the store is
> closed. . . .
>
> Employees must wait for the Manager, Key-Holding Supervisor, or Inventory/LP
> Team Member at the Loss Prevention desk.
>
> Employees must remain punched in until the Manager, Key Holding Supervisor
> or Inventory/LP Team Member is available. Note: At no time should an employee
> punch out and await to be let out of the store.  All employee-waiting time must
> be on the clock.[22]

When queried by the Court during the initial final approval hearing, Class Counsel estimated that

this injunctive relief has an monetary value of $100,000 to $200,000 annually.

The Settlement Agreement stipulates that, excepting opt-outs, all class members release

Best Buy from a range of potential state law claims arising under the facts alleged in the

---

[19]  Joint Stip. ¶ 2.3.

[20]  Joint Stip. ¶ 2.4.1–.2.

[21]  Joint Stip. ¶¶ 2.2.3, 2.3.1–.2.

[22]  Joint Stip. ¶ 2.3.4.

Complaint, whether known or unknown, and accruing between October 17, 2003 and Final Approval (the "Release Period").[23]  In addition, class members who submit claim forms pursuant to this agreement release Best Buy from federal Fair Labor Standards Act claims related to the acts and practices alleged in the Complaint and arising during the Release Period that, including any off-the-clock work.[24]  Consequently, under the Settlement Agreement, all class members, whether or not submitting claim forms, release Best Buy from liability under the enumerated types of state claims, but only participating class members are barred from bringing federal claims.[25]

### C.    Preliminary Approval

On January 27, 2010, Plaintiffs filed a motion seeking this Court's preliminary approval of the proposed Settlement Agreement, certification of a settlement class, appointment of the named plaintiffs as class representatives, approval of a claims administrator, and publication of notice to the putative class [doc. no. 32].[26]  On February 19, 2010, the Court held a hearing on Plaintiffs' unopposed Motion [doc. no. 34].  During the hearing and upon consideration of the Parties' papers, this Court directed the Parties to: (1) revise their proposed order to adequately reflect the role of the proposed claims administrator, Garden City Group; (2) amend the proposed

---

[23]  Joint Stip. ¶¶ 1.41, 2.10.

[24]  Joint Stip. ¶¶ 1.40, 2.10.

[25]  Class members seeking payment from the Net Settlement Fund were required to complete and return the "Consent to Join Settlement and Claim Certification" Form that included a "Consent to Join Settlement Class" Form.  See Notice of Filing of Revised Proposed Order and Revised Proposed Notice to Class Members ("Notice of Revised Proposed Order & Notice") [doc. no. 36], Ex. A at 19. Completing the latter form effected an "opt-in" to the Fair Labor Standards Act Collective Action conditionally certified by this Court.

[26]  Pls.' Mot. for Prelim. Approval.

Class Notice to add specific language regarding class members' rights to hire their own attorneys and enter an appearance through those attorneys; and (3) submit the proposed revised order and revised notice to the Court.[27]  After consideration of the Parties' arguments, supporting documents and other evidence presented at the hearing, this Court granted preliminary approval of the proposed Settlement Agreement, certified both a class and a collective action pursuant to 29 U.S.C. § 216(b) of the Fair Labor Standards Act for settlement purposes only, approved class notices by mail, designated named Plaintiffs Hall, Keck and Eisenhower as Class Representatives and three law firms as class counsel,[28] appointed Garden City Group as Claims Administrator, and approved the revised notice submitted by the Parties.[29]  Both the class and collective action were defined to include: "All individuals who were employed by Best Buy in a non-exempt position at a retail store in Pennsylvania at least one day from October 17, 2003 to November 3, 2009."[30]  The Court directed that notice be mailed within 30 days of the Order and that Defendants file with the Court a proof of mailing of the class notice.  Objectors were required to object within 90 days from date notice was mailed, and class members seeking to appear at the final approval hearing were required to file a notice of intent to appear at least 14 days prior to the hearing.  The Court also set the hearing date for final approval.[31]  The claims process,

---

[27]  See Notice of Revised Proposed Order & Notice & Ex. A.

[28]  The Court approved as Class Counsel the firms Lowey Dannenberg Cohen & Hart, Egan Young PC, and Caldwell Law Office LLC, with Lowey designated as Lead Class Counsel. See Order Granting Preliminary Approval ¶ 4 (May 12, 2010) ("Prelim. Approval Order") [doc. no. 37].

[29]  Prelim. Approval Order ¶ 4.

[30]  Prelim. Approval Order ¶ 2.

[31]  Preliminary Approval Order ¶ 5–7.  The original hearing date of November 5, 2010 was rescheduled for October 22, 2010.  Order, June 4, 2010 [doc. no. 38].

described *infra*, commenced thereafter.

**D.     The First Notice Period**

During the first notice period, the Claims Administrator mailed the notice—later

determined to be defective, as discussed *infra*—to 20,455 putative class members on June 10,

2010.  The notice packet included the Court-approved Notice and associated approved forms:

1. Notice to Class Members Regarding Pendency of a Class and Collective Action and Notice of Hearing on Proposed Settlement;

2. Change of Name and/or Address Information Form;

3. Election to Opt Out of Settlement and Class Action Form; and

4. Consent to Join Settlement and Claim Certification Form ("Consent Form").

The Notice included a description of the litigation, including the list of class claims and

the respective positions of the Parties regarding the outcome of the action; a lengthy description

of the settlement terms, including monetary and injunctive relief and the means of calculating

amounts owed to each class member; the class definition; how to submit a claim under the

settlement; the binding nature of the settlement on all class members who do not exclude

themselves; disclosure of class members' right to opt-out or object and a clear discussion of the

process to do so; and the impact on a claimant's right if they submit a claim form (the release of

state and federal wage and hour claims) or fail to opt-out (the release of state wage and hour

claims).  Each Consent Form included a pre-printed number for the closing shifts each class

member actually worked during the class period, gleaned from Best Buy's employment records.

Pursuant to the Court's Preliminary Approval Order, the deadline to mail the Consent to Join

Settlement and Claim Certification Form and the Opt-out Form, and to file a Notice of Objection,

was September 9, 2010. The Claims Administrator also maintained a toll-free hotline to take inquiries from putative class members, receiving some 534 calls.

During the first notice period, about 10 percent of the class (2,100 class members) filed claim forms, and 38 class members opted out.[32] No objections were filed. The average payment per claim was $71.16. A total of 298,363 closing shifts were claimed by consenting class members, which was adjusted to 298,882 to provide all persons with less than five closing shifts a minimum of five such shifts for damages purposes. No class member submitted a notice of intent to appear at the October 22, 2010 fairness hearing.

After the Parties learned that 977 class members received Claim Certification forms that underestimated closing shifts worked—none of whom opted out and 131 of whom returned claim certification forms—the Claims Administrator sent letters to the 131 responding employees explaining the under-reporting of closing shifts and providing the correct number of closing shifts worked, and sent a revised notice packet to the 846 unresponsive members, giving both groups until November 8, 2010 to respond.[33]

### E. Final Approval Hearing & Second Notice Period

Following the conclusion of the first notice period and claims process, on October 8, 2010, the Parties filed the pending motions: (1) Joint Motion for Final Approval of Proposed Settlement and Allocation Among Class Members [doc. no. 79]; and (2) Plaintiffs' Motion for Attorneys' Fees and Expenses and Enhancement of Awards for Class Representatives [doc. no.

---

[32] Decl. of Jennifer Keough & Final Report of Claims Administrator ("Keough Decl. I") [doc. no. 79-3] ¶ 12.

[33] Keough Decl. I ¶¶ 13–18.

-10-

80]. The stipulation of the Settlement Agreement has not changed since the Court preliminarily approved it. On October 22, 2010, the Court held a final approval hearing to determine the fairness of the settlement and the reasonableness of the requested fees and awards. During that hearing the Court reviewed in detail with the Parties the relevant factors required under <u>Girsh v. Jepson</u>.[34] The Court asked the Parties to submit supplemental statistical information regarding the nature of the class relative to participating class members, and asked Plaintiffs to submit additional evidence to support their request for attorneys fees, including billing records for time spent by class counsel on this litigation. Accordingly, the Claims Administrator submitted requested statistical detail on the class,[35] and Lead Class Counsel submitted additional lodestar detail.[36]

Upon a careful review of the moving papers, the class notice actually provided to class members, and the supplemental data submissions, the Court determined that the notice mailed to class members did not conform to the notice previously approved because it omitted corrective language specifically ordered by the Court during the Preliminary Approval Hearing regarding class members' right to hire and appear through their own attorney. The Court ordered the Parties to explain the discrepancy, and to provide additional information regarding the number of class members who were former employees, the number of notices returned undeliverable, and

---

[34] 521 F.2d 153, 157 (3d Cir. 1975).

[35] Decl. of Jennifer M. Keough and Supplemental Submission of Claims Data ("Keough Decl. II") [doc. no. 82]; Decl. of Jennifer M. Keough and Additional Supplemental Submission of Data ("Keough Decl. III") [doc. no. 84].

[36] Supplemental Decl. of Gerald Lawrence [doc. no. 81].

whether the Parties issued publication notice.[37]  In response, Plaintiffs reported that the Claims

Administrator had erred by mailing the incorrect notice to class members. That notice omitted

language required by this Court and Rule 23(c)(2)(B)(iv) regarding class members' rights to hire

their own attorneys and enter appearances.[38]  Plaintiffs reported that more than 16,000 of the

20,455 class members were former employees.  Plaintiffs also averred that the Claims

Administrator received 3,134 notice packets returned as undeliverable, and that of those 473

packets were returned with forwarding information. Thus, at least 13% of the class did not

receive actual notice of the settlement.  Additionally, because publication notice had not been

provided to supplement the mailed notice, those members also did not receive constructive

notice.

After teleconference with counsel for the Parties on December 9, 2010, the Parties jointly

moved for permission to issue revised notice that included notification of class members' rights

to hire and enter an appearance through individual attorneys, and to issue publication notice to

appear for one-day runs in the Philadelphia Inquirer, the Pittsburgh Post-Gazette, and the

Harrisburg Patriot News.[39]

In addition to including the required language regarding the right to appear through an

attorney, the proposed revised class notice packets included a cover letter explaining that the

putative member may have previously received notice of the proposed class settlement, and that

---

[37]  Order (Dec. 6, 2010) [doc. no. 85].

[38]  Pls.' Resp. to the Court's Inquiries [doc. no. 86].

[39]  Revised Joint Stip. and Mot. to Issue Revised Notice by Mail and Publication to Putative
Class Members [doc. no. 88].

the revised notice contains additional information about the putative class member's rights.  It also explained that if the member previously responded and was satisfied with that response, the prior response would remain valid and binding.  It also explained that if the member did not previously respond, or did respond but wished to change the prior election, the member could do so by returning the appropriate form by the new deadline.  The response forms remained unchanged, except that the Consent Form included a prominent notice that class members who previously filed timely consent forms and did not wish to change their elections need not file a second consent form.

The proposed publication notice prominently declared that it was a "Legal Notice" and that it "may affect [readers'] rights."  It included the following headline in a large, bold font: "If You Are, or Were, Employed by Best Buy in Pennsylvania, You May Qualify for a Payment from a Class Action Settlement."  The remaining copy used plain language and a question and answer format to communicate the nature of the action, the identity of the class, the nature of the settlement, the procedure for submitting a claim and how to obtain claim forms, the rights the class members would surrender if they submit a claim form or fail to opt-out, and the putative class members' rights to opt out or object.  Additionally, it included the required language regarding class members' rights to hire and appear through their own attorneys.  A web address and toll free number were provided both in the copy of the notice and at the bottom of the notice, prominently displayed.

Upon careful review of the sufficiency of the proposed revised notice for mailing, and finding that it included the requisite notice regarding putative class members' rights to appear

through their own attorneys,[40] as well as the sufficiency of the proposed publication notice, this Court granted the motion to issue publication notice and revised individual notice, and scheduled a final fairness hearing on March 21, 2011.[41]

The Claims Administrator mailed the revised notice to all 20,455 putative class members on January 11, 2011, with a deadline of February 14, 2011 for class members to submit exclusion or claims forms or to object to the settlement. Notice was published in the Philadelphia Inquirer, the Pittsburgh Post-Gazette and the Harrisburg Patriot News on January 14, 2011.[42] The Notice was prominently displayed in appropriate sections of those newspapers, rather than in less read classifieds sections.[43]

At the conclusion of the second notice period, more than 14% of the class, or 2,903 class members, submitted claim forms—a nearly 40 percent increase from the prior notice period.[44] The Claims Administrator fielded nearly 1,000 calls during the second notice period, nearly twice the number received during the first notice period.[45] Even after the second notice period and state-wide publication notice, no objections were received and only a total of 55 putative

---

[40] The revised proposed notice included new subsection K, entitled: "Right to Consult with and Hire Your Own Attorney." The text of that subsection stated: "As a Class Member, if you so desire, you may consult with and hire an attorney who may then enter an appearance in this action." See Revised Joint Stip. and Mot. to Issue Revised Notice by Mail and Publication to Putative Class Members [doc. no. 88].

[41] Order (Dec. 29, 2010) [doc. no. 89].

[42] Decl. of Jennifer M. Keough, Proof of Mailing and Supplemental Final Report of Claims Administrator ("Keough Decl. IV") [doc. no. 112] ¶ 3.

[43] See Keough Decl. IV, Ex. B.

[44] Keough Decl. IV ¶ 12.

[45] Keough Decl. IV ¶ 11; Keough Decl. I ¶ 11.

class members have opted out.[46]  No class member submitted a notice of intention to appear at the March 21, 2011 fairness hearing.

The returned claim forms account for a total of 419,704 closing shifts, which was adjusted to 420,401 shifts to provide all persons with less than five closing shifts a minimum of five such shifts for damages purposes.  The average award was $72.41.

This Court held a supplemental final approval hearing on March 21, 2011 to assess the fairness, adequacy and reasonableness of the settlement agreement, the requested attorneys' fees and enhancement awards, and the adequacy of the notice.

## II.    CERTIFICATION OF THE SETTLEMENT CLASS

The Court conditionally certified the classes pursuant to Rule 23 of the Federal Rules of Civil Procedure when it preliminarily approved the class settlement.  The Court here expands on its finding that the class defined by the Preliminary Approval Order satisfies the requirements of Rule 23(a) and 23(b) and will be certified.  The class shall be defined as:

> All individuals who were employed by Best Buy in a non-exempt position at a retail store in Pennsylvania at least one day from October 17, 2003 to November 3, 2009.

Rule 23(a) contains four threshold requirements for class certification: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately

---

[46] Keough Decl. IV  ¶¶ 9–10.

protect the interests of the class."[47]   Two additional certification requirements apply to "opt-out"

class actions, as here, under Federal Rule of Civil Procedure 23(b)(3).  First, "common questions

must predominate over any questions affecting only individual members" ("predominance"), and

second, class action litigation must be "superior to other available methods for the fair and

efficient adjudication of the controversy" ("superiority").[48]   Though ordinarily the Court would

be required under Rule 23(b) to determine whether the class action is manageable, where the

class is being certified for settlement purposes, the inquiry is unnecessary.[49]   As noted previously,

no objection has been registered to any aspect of the Agreement, including class certification.

　　　Numerosity is easily satisfied here given the more than 20,000 putative class members.[50]

Commonality is likewise satisfied because a question of law and fact is common to each class

member: whether Best Buy had a uniform practice of refusing to pay for off-the-clock work that

violated state wage and hour laws.  Typicality requires that the court evaluate whether the class

representatives' incentives are aligned with those of the proposed class.[51]   Here, the claims

asserted by Hall, Keck and Eisenhower all arise from Best Buy's alleged policy of requiring

employees to work off-the-clock and all are non-exempt hourly employees.  Each thus have an

incentive to demonstrate a uniform policy by Defendant of requiring off-the-clock work.  Thus

---

[47] Fed. R. Civ. P. 23(a).  These requirements will be referred to herein as "numerosity,"
"commonality," "typicality," and "adequacy," respectively.

[48] Fed. R. Civ. P. 23(b)(3); In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527 (3d Cir.
2004).

[49] Amchem Prods., Inc.  v. Windsor, 521 U.S. 591, 620 (1997).

[50] Weiss v. York Hosp., 745 F.2d 786, 808 & n.35 (3d Cir. 1984).

[51] Beck v. Maximus, 457 F.3d 291, 296 (3d Cir. 2006).

the class representatives are typical of the class.

Under Rule 23(a), both the class representatives and their attorneys must be able to adequately represent the class. "The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent. . . . [A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members."[52] The Court must examine whether the class representatives' claims are "antagonistic to the class" and whether the attorneys "are experienced and qualified to prosecute the claims on behalf of the entire class."[53] The Court finds no conflicts between the interests of the named representatives, and that the absence of objections to this settlement support that finding, and finds that all named representatives fall within the class definition.

To determine the adequacy of counsel, the Court should determine that class counsel: "(1) possess adequate experience; (2) vigorously prosecuted the action; and (3) acted at arms' length from the defendant."[54] Lowey Dannenberg Cohen & Hart, the firm designated as lead counsel in this matter has extensive experience in prosecuting complex class actions, including class actions for violations of state and federal wage and hour laws, and has achieved settlements amounting to more than $1 billion on behalf of class members.[55] Gerald Lawrence, Lowey's lead attorney on this matter possesses decades of experience in prosecuting class actions and seeking plaintiffs' recovery. Moreover, several facts support a finding that Class Counsel here vigorously

---

[52] Amchem, 521 U.S. at 625 (quotations and citations omitted).

[53] Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).

[54] In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 801 (3d Cir. 1995).

[55] See Decl. of Gerald Lawrence (Jan. 27, 2010) [doc. no. 32-2] ¶ 2; see also www.lowey.com.

prosecuted this action and settled the matter at arms-length from Defendants: (1) discovery conducted in this action sought to determine the strengths of Defendants' position and the underlying merits of the claims; (2) the prosecution of similar actions against Best Buy in other jurisdictions;[56] (3) settlement discussions occurred after discovery began and apparently over a series of months;[57] and (4) the settlement agreement does not grant questionable benefit to Defendants by releasing categories of potential claims of class members not asserted in the Amended Complaint.[58] The Court thus finds both the named representatives and Class Counsel adequately represent the class.

The Court also finds the class action to be superior to other means of adjudicating the claims of class members in this case. To determine superiority, the Court must "balance, in terms of fairness and efficiency, the merits of a class against those of alternative available methods of adjudication."[59] "Federal Rule of Civil Procedure 23(b)(3) instructs that the matters pertinent to this inquiry include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C)

_____

[56] See Order Granting Final Approval of Class Action Settlement, Approving Allocation Among Class Members, Awarding Attorneys Fees and Expenses and Enhancement Award for Class Representatives and Entering Judgment and Dismissal, Turner v. Best Buy Co., Inc., No. 08-1024 (E.D.N.Y. Sept. 28, 2010).

[57] Fact discovery closed in early 2009 and the proposed conditional settlement agreement was not memorialized until November 3, 2009. See discussion *supra* Section I.A.

[58] See In re Community Bank of N. Va., 418 F.3d 277, 307–08 (3d Cir. 2005) (questioning the adequacy of class representation given absence of discovery, aspect of collusion between defendants and plaintiff's counsel, a rapid settlement that gave defendants a release on categories of claims not asserted in the complaint or otherwise noted in the settlement, and an outsized attorneys' fee).

[59] First State Orthopaedics v. Concentra, Inc., 534 F. Supp. 2d 500, 514 (E.D. Pa. 2007).

the desirability or undesirability of concentrating the litigation of the claims in the particular forum."[60]   Here, given the minimal number of class members opting out of the settlement,[61] the lack of objections to the settlement, and the absence of notice that any class member seeks to appear individually in this action, the Court finds little actual or likely class member interest in individually controlling the matter.  Next, the Court is unaware of any related cases involving Pennsylvania employees and Pennsylvania law pending in state or federal court at the time this action was initiated, nor can the Court find any issue that would render this forum undesirable given that only claims under Pennsylvania state law on behalf of employees of Best Buy's Pennsylvania stores are asserted.  And the Court finds that case-by-case litigation of the more than 20,000 potential individual claims resting largely on common issues would be wastefully duplicative and inefficient.  Finally, this Court notes that because the value of individual claims of class members is likely far less than the cost of bringing such claims, this class action is superior to individual litigation.[62]   Thus the Court finds the superiority requirement is satisfied.

The "'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation,' which imposes a standard 'far more demanding' than the Rule 23(a) commonality requirement."[63]   Class treatment is not appropriate if proving elements

---

[60]   In re Community Bank, 418 F.3d at 309 (quotations and citations omitted).

[61]   Only 55 class members, or just one-quarter of one percent of the entire class of 20,455, returned forms excluding themselves from this action.  Keogh Decl. III ¶ 10.

[62]   See Castano v. Am. Tobacco Co.. 84 F.3d 734, 748 (5th Cir. 1996) ("The most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit . . . .").

[63]   In re Ins. Brokerage Antitrust Litig.,  579 F.3d 241, 266 (3d Cir. 2009) (quoting Amchem, 521 U.S. at 623–24).

of the claim requires individual treatment of class members' unique circumstances.[64]  However, where common liability issues that are susceptible to class-wide proof constitute a significant part of the case, predominance may be satisfied even where damages must still be proven by individually.[65]  This is particularly so where damages can be determined by "formula, statistical analysis, or other easy or essentially mechanical methods."[66]  The predominant issue in this case is whether Defendants, as a matter of policy, refused to pay employees for off-the-clock time worked, in violation of Pennsylvania's wage and labor laws.  That question of liability is thus susceptible to common proof and requires application of just one state's law.  Though unique questions as to application of this policy may arise store-by-store, this is not a case where the stores are so numerous and spread nationwide that such individual questions might overwhelm common issues.[67]  Additionally, here, though damages would require member-by-member calculation, the damages inquiry would not overwhelm common issues as damages can be proven by formula or statistical analysis based on each hourly employee's time worked.  Accordingly, the Court finds predominance is satisfied.

Having found the requirements of Rules 23(a) and (b)(3) satisfied, the Court concludes

---

[64]  See id.

[65]  Chiang v. Veneman, 385 F.3d 256, 273 (3d Cir. 2004) (citations and quotations omitted).

[66]  See, e.g., Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d 1159, 1179 (11th Cir. 2010).

[67]  See Farmer v. DirectSat USA, LLC, No. 08-3962, 2010 WL 3927640, at *23 (N.D. Ill. Oct. 4, 2010) (discussing Falcon v. Starbucks Corp., 580 F. Supp. 2d 528, 539–40 (S.D. Tex. 2008), which held that differing applications at multiple stores did not mandate decertification of collective action under the Fair Labor Standards Act).

class certification for settlement purposes is appropriate and the class will be certified.[68]

## III. ADEQUACY OF NOTICE

The notice provided to class members must satisfy the due process clause of the Fifth Amendment and the requirements of Rule 23. "In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class."[69] Due process thus requires "reasonable notice, the opportunity to be heard and the opportunity to withdraw from the class."[70] And here, where the class notice encompasses both notice of certification and settlement, and the class is to be certified under Rule 23(b)(3), notice must comply with the more stringent requirements of Rule 23(c)(2) requiring the best notice practicable.[71] Rule 23(c)(2) provides:

> For any class certified under Rule 23(b)(3), the court must direct to the class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language:
>
> (i)     the nature of the action

---

[68] By meeting the more stringent requirements of Rule 23, the class likewise may be certified as a collective action. See Clesceri v. Beach City Investigations & Protective Servs., Inc., No. 11-3873, 2011 WL 320998, at *4 (C.D. Cal. Jan. 27, 2011).

[69] In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 306 (3d Cir.1998).

[70] Id. Courts in this Circuit have stated that "[t]he notice must be reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Nichols v. SmithKline Beecham Corp., No. 00-6222, 2005 WL 950616, at *9 (E.D. Pa. April 22, 2005) (quoting Lachance v. Harrington, 965 F. Supp. 630, 636 (E.D. Pa. 1997)).

[71] See Larson v. Sprint Nextel Corp., No. 07-5325, 2009 WL 1228443, at *3 (D.N.J. Apr. 30, 2009); In re CertainTeed Corp. Roofing Shingle Prods. Liab. Litig., 269 F.R.D. 468, 480–81 (E.D. Pa. 2010) (applying both Rule 23(c)(2) and Rule 23(e)).

| (ii)  | the definition of the class certified; |
|-------|----------------------------------------|
| (iii) | the class claims, issues, or defenses; |
| (iv)  | that a class member may enter an appearance through an attorney if the member so desires; |
| (v)   | that the court will exclude from the class any member who requests exclusion; |
| (vi)  | the time and manner for requesting exclusion; and |
| (vii) | the binding effect of a class judgment on members under Rule 23(c)(3).[72] |

Rule 23(c)(2) also provides that individual notice should be sent to members whenever reasonably possible. Rule 23(e) requires that prior to approving the settlement, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal."[73]

That the content of class notice here was sufficient to satisfy the requirements of both due process and Rule 23 is clear. As demonstrated by the description of the Class Notice in Sections I.D and I.E *supra*, the second notice packet and publication notice provided the content required by the Due Process and Rule 23. As noted above, this Court took special pains to ensure that the Notice included explicit statements of class members' rights to appear in this action through individually retained attorneys, as required under Rule 23(c)(2)(B), by requiring at the Preliminary Approval Hearing that the Parties revise their notice to include explicit language to that effect, and by later requiring Defendant to reissue notice when the Court learned that the Notice actually sent to class members excluded that language.

Further, this Court finds that notice was directed to class members in a reasonable manner. Initially, individual notice was provided to class members based on known addresses

---

[72] Fed. R. Civ. P. 23(c)(2); In re CertainTeed Corp., 269 F.R.D. at 480–81.

[73] Fed. R. Civ. P. 23(e).

provided by Defendants and updated addresses provided by the U.S. Postal Service's National Change of Address database.[74]  Upon this Court's discovery that a substantial portion of the class was made up of former employees and that an unacceptable number of the notice packets were returned undeliverable, and after teleconference with the Parties, the Court approved publication notice to be provided in three state daily newspapers during the second notice period.  Thus, though ordinarily individual notice is considered the best practicable notice where, as here, the identities of the class members are known or reasonably ascertainable,[75] supplemental publication notice provides sufficient and adequate notice to those class members who, though known, could not be reached individually.[76]  Indeed, this combination of individual and publication notice provides the best notice practicable.[77]  Accordingly, the Court finds notice satisfies the requirements of due process and Rule 23.

III.   **Evaluation of the Settlement Terms**

Under Federal Rule of Civil procedure 23(e), "[t]he claims . . . of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."[78]  Generally,

---

[74]  Keough Decl. II ¶ 5.

[75]  In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig., 89 F. App'x 314, 316 (3d Cir. 2003) ("Individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort.") (quoting Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173 (1974)).

[76]  In re Found. for New Era Philanthropy Litig., 175 F.R.D. 202, 205 n.3 (E.D. Pa. 1997).

[77]  In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 527–28 (D.N.J. 1997) (combination of mailed and publication was "ideal") aff'd 148 F.3d 283 (3d Cir. 1998).

[78]  Fed. R. Civ. P. 23(e).

settlements are favored in the class action context,[79] but a district court serves "as a fiduciary who must serve as a guardian of the rights of absent class members" when evaluating a proposed settlement.[80] This is particularly so where class certification is sought for settlement purposes only.[81] The Court may accept the proposed Agreement only if the parties have shown it to be fair, reasonable, and adequate.[82]

As noted, by Order of May 12, 2010, the Court preliminarily approved the Agreement.[83] Now the Court must evaluate the fairness, reasonableness and adequacy of the settlement according to the factors identified in Girsh v. Jepson.[84] The nine factors are:

> (1) The complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[85]

---

[79] In re Gen. Motors, 55 F.3d at 785.

[80] Id.

[81] Id. at 787. The Third Circuit Court of Appeals has noted the considerable problems courts and commentators have identified with settlement classes, as well as their potentially substantial benefits, and requires district courts to evaluate them pursuant to Rule 23 with particular care. Id. at 794.

[82] Fed. R. Civ. P. 23(e)(2); In re Gen. Motors, 55 F.3d at 785.

[83] See doc. no. 21.

[84] 521 F.2d 153, 157 (3d Cir. 1975).

[85] In re Cendant Corp. Litig., 264 F.3d 201, 232 (3d Cir. 2001) (quoting Girsh, 521 F.2d at 156–57).

No single factor is dispositive.[86]  The Court considered each of these factors during its

first final approval hearing on October 22, 2010, and upon consideration of supplemental data

submitted by the Parties as to the nature of the class and those class members submitting claims

forms, concludes that the settlement agreement is fair, reasonable and adequate.

The first factor "captures the probable costs, in both time and money, of continued

litigation."[87]  This matter, involving more than 20,000 class members, was litigated for nearly

two years prior to the memorialization of the settlement agreement.  Were it to continue,

additional merits discovery may be required, costly experts would be necessary, case dispositive

motions would be filed, argued and possibly appealed, and trial preparation would be required.

The Court therefore finds that this factor weighs in favor of settlement.[88]

The second factor clearly weighs in favor of the settlement given that the reaction to the

class has been almost uniformly positive: of some 20,455 class members, nearly 3,000 claims

have been filed, only 55 members—or roughly one-quarter of one percent of the class—have

excluded themselves from the settlement, and no objections have been filed.  That so few

members of the class have opted out is particularly significant given that individual notice was

given twice in this case, and prominent publication notice was provided by a one-day run in three

state daily newspapers.

The third factor also favors the settlement.  This factor "captures the degree of case

---

[86]  In re Orthopedic Bone Screw Prods. Liab. Litig., 176 F.R.D. 158, 184 (E.D. Pa. 1997).

[87]  In re Warfarin, 391 F.3d at 535–36 (quotations and citation omitted).

[88]  See, e.g., Moore v. Comcast Corp.  No. 08-773, 2011 WL 238821, at *3 (E.D. Pa.  Jan. 24, 2011); Rosenau v. Unifund Corp., 646 F. Supp. 2d 743, 752 (E.D. Pa. 2009); Choike v. Slippery Rock Univ. of Pa. of the State Sys. of Higher Educ., No. 06-622, 2007 WL 2317323, at *3 (W.D. Pa. Aug. 8, 2007).

development that class counsel has accomplished prior to settlement," permitting a court to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating."[89] It "ensure[s] that a proposed settlement is the product of informed negotiations."[90] Here, the settlement was reached after significant discovery: class counsel interviewed a large number of class members; written discovery was conducted; documents, including corporate policies and procedures and time records were produced; and depositions of class representatives and corporate 30(b)(6) designees were taken. From this, Class Counsel avers that Plaintiffs were able to assess the merits of the various claims made and determined that claims for off-the-clock work beyond those for security checks at closing shifts—the basis for the relief provided in this settlement—would prove difficult to sustain based on the infrequency of occurrence and Best Buy's policy of providing employees who worked through meal and rest breaks a means of recording that time. The Court finds that counsel could thus reasonably estimate the strength and value of the case at the time of settlement negotiations.

The fourth through sixth factors assess the risks the Parties face in establishing liability and damages, and in maintaining the class. The Court must assess "what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them,"[91] to "measure the expected value of litigating the action rather than settling it at the current time,"[92] and the difficulties likely to be encountered in certification. The risks of

---

[89] In re Warfarin, 391 F.3d at 537 (quotation and citation omitted).

[90] In re Prudential, 148 F.3d at 319.

[91] In re Cendant, 264 F.3d at 237 (citing In re Gen. Motors, 55 F.3d at 814).

[92] In re Gen. Motors, 55 F.3d at 816.

establishing liability were identified above, and suggest that while claims for time spent by closing shift workers awaiting off-the-clock security checks were strong and supported by video tapes and other evidence, there existed substantial barriers to proving liability for off-the-clock work under other circumstances. Further, counsel avers that proving damages in this matter for all the claims at issue would prove risky, given difficulties in proving the amount of time worked off the clock. Thus there were risks to the class in proving both liability and damages for all claims. As for the difficulty of maintaining the case as a class action, given the size and relative uniformity of the class, the relatively small amount of individual claims, and the predominance of liability issues in this action, it appears likely this action would be maintainable as a class action were it to proceed. Nonetheless, "there is always some risk that a class certified for settlement purposes could create intractable management problems," and no doubt, Defendants would "oppose certification of the Class and could also seek to decertify the certified class prior to trial."[93] Thus, these factors weigh in support of the settlement.

The seventh <u>Girsh</u> factor weighs against settlement, as Best Buy's annual revenues are averred to be $45 billion.[94] Though the Parties suggest this factor is neutral, clearly Defendant could withstand a settlement far greater than $907,566.

The eighth and ninth factors test "whether the settlement represents a good value for a weak case or a poor value for a strong case."[95] They are "two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the

---

[93] <u>Barel v. Bank of Am.</u>, 255 F.R.D. 393, 401 (E.D. Pa. 2009) (citations and quotations omitted).

[94] Mem. in Supp. of Final Approval at 15.

[95] <u>In re Warfarin</u>, 391 F.3d at 538.

parties would face if the case went to trial." [96]  During the first fairness hearing, the Court

expressed concerns about the breadth of the claims released by the settlement given that relief

provided under the agreement was based solely on the number of closing shifts worked.  Thus,

class members who worked few or no closing shifts are barred from bringing any state wage and

hour claim for any conduct related to that described in the complaint but would received only

nominal recovery under the settlement agreement.   Based on data provided by the Parties after

the first final approval hearing, a majority of the class members worked 50 or fewer closing

shifts, with the ability to recover only $25.00 or less under the settlement agreement.[97]  But after

lengthy discussion with Class Counsel during the first final approval hearing regarding the

weakness of any class-wide claims for off-the-clock work beyond closing shift security checks,

the Court concludes that, for class members working few closing shifts, the settlement represents

a good value for weak cases.  The Court similarly concludes that the settlement presents a good

value for the strong case to be made by closing shift workers as well.  Those class members who

worked a substantial number of closing shifts, and thus have strong claims, will recover more

than nominal amounts.  As noted, the average recovery in this settlement exceeds $72, with some

members recovering hundreds of dollars.  And the Court is likewise satisfied, based on the

testimony of Class Counsel during the first final approval hearing, that the amount of $.50 per

closing shift is a reasonable amount given the strength of the proof in this case.  The Parties

determined that amount based on discovery in the case demonstrating an average wage of class

members of roughly $8.00 per hour and an estimated average waiting time for security checks of

---

[96]  Id. (citing In re Prudential, 148 F.3d at 322).

[97]  See Keogh Decl. II, Ex. A.

-28-

5 minutes per shift. Counsel averred that proof of waiting times in excess of that amount would be difficult to sustain. Accordingly, the Court is satisfied that these last <u>Girsh</u> factors weigh in favor this settlement.

Having found, upon careful review of the settlement terms, the efforts of class counsel, and the nature of the claims and the class that the majority of the <u>Girsh</u> factors weigh in favor of the Settlement Agreement, the Court finds the settlement to be fair, adequate and reasonable.

## IV.    ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVE'S ENHANCEMENT AWARDS

### A.    Attorneys' Fees & Costs

The Court must thoroughly review requests for attorneys fees.[98]  Plaintiffs' Counsel ask the Court to approve an award of $300,000 to Class Counsel for attorneys' fees and expenses.[99]

The Third Circuit Court of Appeals has approved the "percentage of the recovery" method for determining appropriate attorneys' fees method where, as here, class members recover from a common fund.[100]  Though this is not a traditional common fund case because unclaimed amounts in the net settlement fund are returned to Best Buy and any award for attorneys's fees does not affect class recovery, use of the percentage-of-recovery method is still appropriate.[101]  Awards based on lodestar are more appropriate in statutory fee-shifting cases

---

[98]  <u>In re Gen. Motors</u>, 55 F.3d at 819.

[99]  Mem. in Supp. of Pls.' Mot. for Award of Attorneys' Fees and Expenses and Enhancement Awards for Class Representatives ("Pls.' Mem. in Supp. of Fees & Awards") [doc. no. 80-1].

[100]  <u>In re Rite Aid Corp. Sec. Litig.</u>, 396 F.3d 294, 300 (3d Cir. 2005) (citing <u>In re Prudential</u>, 148 F.3d at 333).

[101]  <u>In re Cendant Corp. PRIDES Litigation</u>, 243 F.3d 722, 734 (3d Cir. 2001) ("Though this is not a traditional common-fund case, because the unclaimed portion of the settlement fund is returned to Cendant and because the plaintiffs who recover may not be affected by the attorneys' fee award . . . use of

where the total recovery for the class may be too low to adequately compensate class counsel.[102]

Nonetheless, Courts may evaluate class counsels' lodestar as a cross-check on the reasonableness of the award sought.[103]  Accordingly, the Court "first calculates the percentage of the total recovery that the proposal would allocate to attorneys' fees by dividing the amount of the requested fee by the total amount paid out by the defendant; it then inquires whether that percentage is appropriate based on the circumstances of the case."[104]  The Court may thereafter compare the dollar amount of the requested award with counsels' lodestar in the case.  The lodestar is the product of the number of hours reasonably worked on the case and a reasonable hourly billing rate for that market, type of case and level of experience.[105]  The Court then divides the requested fee by the lodestar to determine the multiplier.  The higher the multiplier the more unreasonable the fee award.[106]

Plaintiff's counsel request a fee that is 33% of the total possible amount that could be paid out by Defendants under the Agreement.  When evaluating whether a fee based on a percentage of recovery is appropriate, a district court should consider several non-exclusive

---

the percentage-of-recovery method is appropriate in this case.").

[102]  In re Rite Aid, 396 F.3d at 300.

[103]  Id. at 305.

[104]  In re Cendant, 264 F.3d at 256.

[105]  In re Rite Aid, 396 F.3d at 305.

[106]  In re Veritas Software Corp. Sec. Litig., No. 08-3627, 2010 WL 3852824, at *3 (3d Cir. Oct. 4, 2010) ("[M]ultiplier of 1.52 was well within the range of attorneys' fees awarded and approved by this Court");  In re Cendant, 243 F.3d at 742 (multiplier of three is reasonable); In re Prudential, 148 F.3d at 340-41 (3d Cir. 1988) (noting multipliers of one to four are generally approved, but questioning multiplier of 5.1).

factors, including: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of non-payment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.[107]  These factors are similar to the Girsh factors analyzed *supra* and thus to avoid repetition the Court abbreviates its analysis of them here.[108]

As an initial matter, this Court rejects Class Counsel's assertion in briefing[109] and at the first final approval hearing that among the reasons to grant the fee award request is that doing so does not affect compensation to the class.  Here, the Settlement Agreement caps the total award to class members at $592,566, and provides for a separate fund of up to $300,000 for attorneys fees.  Thus, whether this Court awards the full request or nothing at all, compensation to the class is unaffected.   The Third Circuit has long recognized, however, that Class Counsel's argument does not reflect "practical realities" of settlement negotiations that the total amount of cash available is a "constructive common fund" as Defendants are rarely interested in the allocation

---

[107] Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000).  In addition to these factors, courts may also consider the benefits to class members attributable to class counsel versus the government or some other group; the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement, and any innovative terms of the settlement.  In re AT&T Corp., 455 F.3d 160, 165 (3d Cir. 2006).  The Court notes that the first factor is not relevant here, that a 33% fee is typical in privately negotiated contingent-fee cases and that the settlement includes injunctive relief to prevent further non-payment for off-the-clock post-shift waiting time—relief that while not particularly innovative, goes beyond pure monetary relief and protects Best Buy's hourly workers going forward.  These factors thus weigh in favor of the fee award as well.

[108] In re Rite Aid, 396 F.3d at 301 n.9.

[109] Pls.' Mem. in Supp. of Fees & Awards at 9, 11.

between the class and class counsel.[110]  And this Court must be ever conscious of the "risk that

the divergence in financial incentives present here creates the 'danger . . . that the lawyers might

urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet

treatment for fees.'"[111]  This is particularly so here, where the fees sought by Counsel are roughly

double the *actual* compensation of the class members based on the claims submitted.

Here, the fund provided for the benefit of some 20,455 class members and the total

possible amount that could have been claimed approached $600,000.  No member has objected to

the settlement or to the amount of attorneys' fees that were described in detail in the mailed

notice.

Next, the Court considers the skill and efficiency of Plaintiffs' counsel, "as measured by

the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery,

the standing, experience and expertise of the counsel, the skill and professionalism with which

counsel prosecuted the case and the performance and quality of opposing counsel."[112] As noted,

class counsel in this case are experienced in the class litigation and prosecuted this case

aggressively.  The notice and claims process in this litigation could have been more efficiently

executed by both Plaintiffs' counsel and the Claims Administrator, but was essentially fulfilled to

the Court's satisfaction nevertheless.

As to the duration of the litigation (its complexity having been addressed above) and risk

---

[110]  In re Gen. Motors, 55 F.3d at 819–20.

[111]  Id. at 820 (citing Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 524 (1st Cir. 1991).

[112]  Nichols, 2005 WL 950616 at *22 (citing In re Ikon Office Solutions, Inc. Sec. Litig., 194
F.R.D. 166, 194 (E.D. Pa. 2000)).

of non-payment, the Court notes that while this case has been pending, Class Counsel have not received any payment, and, by proceeding on a contingent-fee basis, ran substantial risk of non-payment, given that discovery revealed that claims regarding off-the-clock time, other than time awaiting security checks, would be difficult to support.

Because Plaintiffs, in their moving papers, provided only the total number of hours spent on this litigation in combination with similar litigation class counsel brought against Best Buy in the Eastern District of New York, the Court required Plaintiffs to submit time records for the Pennsylvania litigation. Without such data, this Court could not evaluate the propriety of the attorneys' fees requested here. Plaintiffs thereafter submitted detailed time records for this action, demonstrating that the firm Lowey Dannenberg Cohen & Hart spent some 655 hours prosecuting this action, the firm Egan & Young spent 306 hours, and Caldwell Law Office spent 66 hours prosecuting action.[113] It is thus clear that Plaintiffs' counsel devoted considerable time and effort to prosecuting the class claims.

Finally, the Court notes that the requested fee award amounting to 33% of the common fund is comparable to the percentage awarded in similar employment or wage and hour cases.[114] And, after conducting a lodestar cross-check, the Court confirms the reasonableness of the fee award. Here, class counsels' lodestar as reported by the detailed billing records is approximately

---

[113] See Decl. of Gerald Lawrence, Exs. A, C, D [doc. nos. 81-1, 81-3, 81-4].

[114] See, e.g., Chemi v. Champion Mortg., No. 05-1238, 2009 WL 1470429, at *12 (D.N.J. May 26, 2009) ("Attorneys' fees of approximately 30 percent of the common fund are . . . regularly awarded in labor and employment class actions."); Burkholder v. City of Ft. Wayne, No. 08-273, 2010 WL 4457310, at *5 (N.D. Ind. Nov. 1, 2010) (awarding 33% of common fund and collecting Fair Labor Standards Act cases in which fees amounting to 33% of the common fund were awarded).

$475,000,[115] producing a multiplier significantly less than one.

Accordingly, the Court will approve Plaintiffs' Motion for Attorneys' fees and costs in the amount of $300,000.

**B.    Enhancement Awards**

Plaintiffs also move for approval of $15,000 in enhancement awards to named-Plaintiffs Hall, Keck and Eisenhower in the amount of $5,000 each.[116]  The Court has broad discretion to award payment to class representatives for their efforts to benefit the class.  Factors courts use to evaluate the appropriateness of awards include the financial, reputational and personal risks to the plaintiff; the degree to which the Plaintiff was involved in discovery and other litigation responsibilities; the length of the litigation; and the degree to which the named plaintiff benefitted (or not) as a class member.[117]

Though Plaintiffs' moving papers provided little detail about the involvement of class representatives in the litigation, in a colloquy with Plaintiffs' counsel Gerald Lawrence during the first final approval hearing, the Court learned that each named plaintiff was deposed and spent time preparing for the deposition,[118] provided records, assisted in the preparation of production requests, and reviewed written discovery requests.  Though the Court is unaware of the sum each class representative recovered from the settlement, based on the average claim

---

[115] See  Decl. of Gerald Lawrence, Exs. A, C, D.

[116] Pls.' Mem. in Supp. of Fees & Awards.

[117] In re Janney Montgomery Scott LLC Fin. Consultant Litig., No. 06-3202, 2009 WL 2137224, at *12 (E.D. Pa. July 16, 2009).

[118] Eisenhower's deposition lasted two days, posing particular burdens on him due to his back problems.

amount for the class as a whole, the Court doubts it could be sufficient to compensate class representatives for their time and efforts spent litigating this action and their service to the class.

Finally, the Court finds the requested amount is well within the range of incentive awards courts have approved,[119] and is equivalent or lower than awards provided in cases where plaintiffs were actively involved in the litigation.[120]   Accordingly, this Court will approve the requested enhancement awards for each of the named Plaintiffs in recognition of their service to the benefit of the class.

## IV.   CONCLUSION

For the foregoing reasons, the Court certifies the settlement class, approves the settlement agreement, finding that the agreement is fair reasonable and adequate and that notice satisfied the requirements of Due Process and Rule 23, and grant's Plaintiffs' requests for attorneys' fees and enhancement awards.  An appropriate Order follows.

---

[119]   See, e.g., In re SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 535 (E.D. Pa. 1990) (approving enhancement award of $5,000 per named plaintiff because plaintiffs "rendered a public service" by assisting enforcement of the law, and have conferred a monetary benefit on the class).

[120]   In re Am. Inv. Life Ins. Co. Annuity Mktg. & Sales Practices Litig., 263 F.R.D. 226, 245 (E.D. Pa. 2009) (incentive award of between $5,000 and $10,000 where named plaintiffs prepared for and testified in depositions that exposed their private financial affairs, participated in preparing responses to interrogatories, and produced extensive documents).